# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

---

**ROMAN CATHOLIC FOUNDATION,**
**UW-MADISON, INC., et al.**
        **Plaintiffs,**

    **v.**                          **Case No. 07-C-0505**

**The Regents of the University of**
**Wisconsin System, DAVID G. WALSH,**
**et al.,**
        **Defendants.**

---

## DECISION AND ORDER

Plaintiff Roman Catholic Foundation, UW-Madison, Inc. ("RCF") and two of its student members, Elizabeth A. Planton and Elizabeth A. Czarnecki, bring this action against the Regents of the University of Wisconsin and various University officials under 42 U.S.C. § 1983. Plaintiffs challenge the constitutionality of the University's refusal to fund certain activities out of the University of Wisconsin-Madison's segregated fee account, which funds a variety of student activities. Plaintiffs argue that the University's refusal to fund activities involving "worship," "proselytizing" or "sectarian religious instruction"[1] constitutes viewpoint discrimination in violation of the First Amendment. The University contends that the First Amendment's Establishment Clause required it to refuse to fund such activities. In January 2008, Judge Shabaz preliminarily enjoined the University "from enforcing any policy that prohibits or prevents plaintiffs from applying for or obtaining

---

[1]The University uses the phrases "sectarian religious instruction" and "inculcation of belief in a particular religious faith" interchangeably. I will use the former phrase.

reimbursement for activities listed in plaintiffs' 2007-08 approved budget because the activities are or involve religious speech considered prayer, worship and/or proselytizing." (Dkt. # 50 at 12.)  The parties now cross move for summary judgment.[2]

## I. BACKGROUND

### A.    The Segregated Fee System

Each semester, the University of Wisconsin-Madison collects approximately $400.00 from each full-time student and allocates it to segregated fees, which support a variety of non-instructional student services, programs and facilities related to the University of Wisconsin's overall educational mission.  The University deposits some of these fees – about $33.00 per student per semester – into the General Student Services Fund ("GSSF"), which funds the activities of qualified student organizations, including "expressive activities, concerts, some athletic activities, and recreational activities."  (Proposed Finding of Fact [hereinafter "PFOF"] ¶ 440.)  The purpose of the GSSF is "to provide a source of funds to ensure that students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall."  (PFOF ¶ 441.)

In order to obtain funds from the GSSF, a student organization must be a "registered student organization" ("RSO") and meet additional criteria ("GSSF eligibility criteria").  The Associated Students of Madison ("ASM"), the student government, bears primary responsibility for establishing such criteria.  University administrators, including the

---

[2]The case was reassigned from Judge Shabaz to Chief Judge Crabb, who subsequently recused herself.  The case was then randomly assigned to me as a designated judge for the Western District of Wisconsin.

Chancellor, are also involved, although the parties dispute to what extent.  The ASM's finance committee, the Student Services Finance Committee ("SSFC"), plays a major role in allocating GSSF funds among eligible RSO's.  Student organizations submit proposed budgets to the SSFC, which makes recommendations to the ASM, which in turn makes recommendations to the Chancellor, who makes recommendations to the Regents.  After a student organization incurs an approved expense, it either submits the invoice to the GSSF or pays it and seeks reimbursement.  The University does not dispense cash directly to any student organization.

In Board of Regents of the University of Wisconsin System v. Southworth, 529 U.S. 217 (2000), several students challenged the segregated fee system under the First Amendment.  They argued that the system unconstitutionally compelled speech because it required them to fund expression with which they disagreed.  The Supreme Court rejected their claim, reasoning that "[t]he First Amendment permits a public university to charge its students an activity fee used to fund a program to facilitate extracurricular student speech if the program is viewpoint neutral."  Id. at 221.  On remand, the lower courts explored the requirement of viewpoint neutrality as it relates to segregated fees.  See, e.g., Southworth v. Bd. of Regents of the Univ. of Wis. Sys. ("Southworth II"), 307 F.3d 566 (7th Cir. 2002).

## B.    Plaintiffs' Funding Requests

Plaintiff RCF is a non-profit corporation which, prior to May 1, 2007, was known as the University of Wisconsin Roman Catholic Foundation, Inc. ("UWRCF").[3]  RCF's purpose

---

[3]The University contends that RCF "did not exist until May 1, 2007" (e.g., Resp. to PFOF ¶ 3), but this assertion is incorrect.  Although it has had many different names, RCF has existed since 1907.  See http://www.wdfi.org/apps/CorpSearch/Search.aspx? (enter "Roman Catholic Foundation" into search field and then click first result) (last visited Sept.

is to "promote the religious, charitable, and educational interests of Roman Catholic and non-Roman Catholic students, faculty, and staff at UW-Madison." (PFOF ¶ 5.)  Prior to 2003, RCF had not sought funding from the University's pool of segregated fees.  In 2003, however, UWRCF applied for GSSF funds for the 2004-05 academic year.  The University questioned its eligibility but eventually approved a portion of its requested budget.  In 2004, UWRCF applied for GSSF funds for the 2005-06 academic year.  Administrators again questioned its eligibility.  Eventually, however, the University approved about sixty percent of UWRCF's 2005-06 budget request.

In 2005, UWRCF applied for GSSF funds for the 2006-07 academic year.  Administrators reiterated their concerns about eligibility, and the Chancellor questioned whether UWRCF had qualified as an RSO.  Ultimately, the University approved UWRCF's 2006-07 budget, although the Chancellor cautioned that in the future, UWRCF would have to become an RSO before it could receive further GSSF funding.

In 2006, UWRCF applied for GSSF funds for the 2007-08 academic year and for RSO status.  The University denied the latter request for two reasons.  First, contrary to established criteria, UW-Madison students did not control UWRCF; the St. Paul's Catholic Center and various religious officials including a pastor and a bishop did.[4]  Second, contrary to the University's policy against religious discrimination by RSOs, UWRCF restricted its membership to Roman Catholics.  In response, UWRCF sued the University, seeking to

---

19, 2008).  However, prior to May 1, 2007, RCF was a significantly different organization and operated under a different name.

[4]RCF disputes that students did not control UWRCF.  However, I need not discuss the issue since, as will be discussed, the University ultimately granted RCF RSO status.

4

enjoin enforcement of the RSO eligibility criteria.  Judge Shabaz preliminarily enjoined the non-discrimination policy but not the requirement that RSOs be student-run.  On May 2, 2007, the parties settled.  UWRCF agreed to change its name to RCF and to submit to student control.  The University agreed to recognize RCF as an RSO and to allow it to obtain GSSF funding.  However, RCF agreed not to seek funding for "masses, weddings, funerals, or other sacramental acts requiring the direct control of ordained clergy."  (PFOF ¶ 178.)  The University also agreed to approve RCF's 2007-08 budget request.

In June 2007, however, the University concluded that it could not properly reimburse RCF for four of its 2006-07 budget expenditures because they supported activities that constituted worship, proselytizing, or sectarian religious instruction.  The University believed that if it paid for such activities with state funds, it would violate the Establishment Clause.  The disputed expenditures for 2006-07 involved:

(1) The Mentoring for Busy Students program, which the parties describe as follows (although they dispute some of the details):

> [S]tudents participating in the [Mentoring for Busy Students program] met with one of the spiritual directors for spiritual mentoring/counseling and to talk about anything they wanted for a half-hour.  The spiritual directors included Catholic nuns and priests who would offer guidance or prayer if requested by the student.

(PFOF ¶ 457).

(2) The Evangelical Catholic Institute, which the University describes as "a primary training institute for [RCF's] leaders to learn from a Catholic perspective how to talk to people about prayer, worship, and the Catholic faith."  (PFOF ¶ 460.)  The Institute's agenda included a variety of activities, including masses, prayer, and worship sessions.  RCF states that although the funding would have supported the Institute, it would not have

directly paid for the masses and worship sessions.  Besides the mass and worship sessions, the Institute included speakers that discussed Christian faith and belief.

(3) A drum shield, a device that helps control the sound of a set of drums, which RCF's praise and worship band uses at its Alpha-Omega programs, which help "undergrads explore their faith."  See  http://www.stpaulscc.org/ao.php (last visited Sept. 23, 2008); (see also PFOF ¶ 456).

(4) Printing costs for Rosary instructional pamphlets (PFOF ¶ 453), which assist "students in learning more about the Rosary prayer itself as well as how to pray the Rosary."  (PFOF ¶ 462).

The University generally approved RCF's 2007-08 budget but continued to deny funding for activities that it considered worship, proselytizing or sectarian religious instruction.  The disputed 2007-08 expenditures included those disputed in 2006-07 and also the Evangelical Summer Training Camp, which the University describes as "essentially a retreat that serves as training for the organization's leaders . . . [T]he daily schedule . . . included three masses and four communal prayer and worship programs."  (PFOF ¶ 455.) RCF states that the expenditures paid for students to attend the entire program and did not directly support the prayer and worship elements.  The final disputed 2007-08 budget item was an expenditure for the Samuel Group program, which involved RCF's bringing nuns from Italy to Madison to meet with RCF students "in an effort to help students look more closely at their path in the world," including helping students choose a major and to determine whether they were "meant to be a priest, or religious, or to be married."  (PFOF ¶ 459.)

6

Although the University declined to fund the above activities,[5] it funds many other RCF activities, including large and small group discussions, educational and service offerings, theater and choral activities, and student orientation and welcoming activities. (PFOF ¶ 465.)  The University has drawn a line between activities that constitute worship, proselytizing and sectarian religious instruction and those that constitute "dialog, discussion or debate" from a religious perspective.  (Defs.' Br. in Opp'n at 14.)

## C.   GSSF Eligibility Criteria

In addition to challenging University funding decisions, RCF contends that one component of the University's GSSF eligibility criteria – so-called "Criterion C" – is unconstitutionally vague.  To ascertain whether it is GSSF-eligible, an RSO first applies at the student government level and ultimately works its way up to the Chancellor, who has the final say.  In 2007, the student government determined that RCF would not be eligible for GSSF funding for the 2008-09 academic year because it did not satisfy Criterion C.  In its original form, Criterion C stated that:

> (C) The organization/program must provide a specific and identifiable educational benefit and service to the students of the University.  This benefit or service may include event programming and/or leadership development opportunities, but must also have significant additional components.

(PFOF ¶ 264.)  During the eligibility review process, members of the SSFC confessed confusion about Criterion C's meaning and denied RCF GSSF eligibility.  Although the Student Judiciary, another branch of student government, attempted to clarify Criterion C,

---

[5]As a result of the preliminary injunction, the University currently funds worship, proselytizing and sectarian instruction by RCF, including the activities discussed above.  The University has not paid for activities that occurred in 2006-07 and 2007-08; those activities took place before Judge Shabaz entered the preliminary injunction.

it seemed only to add to the confusion.  In December 2007, the SSFC revised Criterion C so that it provided:

> The group must provide to the students of the University a specific and identifiable educational service, which must include significant components beyond event programming and leadership development opportunities. (Though not necessary, event programming and/or leadership development opportunities may be present, but alone do not constitute an educational service.)

(PFOF ¶ 396.)  In February 2008, the SSFC reconsidered RCF's eligibility under the revised Criterion C and again found RFC ineligible.  RCF appealed to the Student Judiciary, which upheld the decision.  However, RCF then appealed to the Chancellor, who found it eligible for funding and noted that neither version of Criterion C was very clear and that Criterion C would not be applied in future years.

## II.  DISCUSSION

I may grant summary judgment only when the materials before me demonstrate "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Miller v. American Airlines, Inc., 525 F.3d 520, 523 (7th Cir. 2008).

## A.    Plaintiffs' Free Speech Claims

### 1.    Applicable Principles

In Southworth and an earlier decision, Rosenberger v. Rector & Visitors of the University of Virginia, 515 U.S. 819 (1995), the Supreme Court set the parameters for plaintiffs' Free Speech claims.  In Southworth, the Court held that its "public forum" cases governed whether a university could compel students to pay segregated fees that would fund expression which they opposed.  529 U.S. at 229-30.  The Court reasoned that

8

although the University's segregated fee system was "not a public forum in the traditional sense of the term," the University had created a nonphysical forum involving financial support for speech.  Id. at 230.  The Court also recognized that the system contained "high potential for intrusion on the First Amendment rights of the objecting students" because "it is all but inevitable that the fees will result in subsidies to speech which some students find objectionable and offensive to their personal beliefs."  Id. at 232.  The Court held, however, that

> [t]he University may determine that its mission is well served if students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects in their extracurricular campus life outside the lecture hall.  If the University reaches this conclusion, it is entitled to sustain an open dialogue to these ends.

Id. at 233.

The Court added that the First Amendment placed some limits on the segregated fee system and that "the principal standard of [First Amendment] protection for objecting students . . . is the requirement of viewpoint neutrality in the allocation of funding support." Id.  In elaborating on such requirement, the Court relied on Rosenberger, discussed in more detail below, in which it held that student fees used to construct a "metaphysical" public forum must be distributed on a viewpoint neutral basis.  Rosenberger, 515 U.S. at 830.  In Southworth, the Court summarized the combined effect of its Southworth and Rosenberger holdings: "Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance and for insuring the integrity of the program's operation once the funds have been collected," Southworth, 529 U.S. at 233, concluding that "the University of Wisconsin may sustain the extracurricular dimensions of its programs by using

9

mandatory student fees with viewpoint neutrality as the operational principle." Id. at 233-34.

In Southworth, the parties stipulated that the University's segregated fee system was viewpoint neutral.[6]  In Rosenberger, however, which involved the University of Virginia's policy of paying the printing costs of a variety of student publications, viewpoint  neutrality was the central issue.  515 U.S. at 822.  The University of Virginia financed its policy in a manner similar to the University of Wisconsin's segregated fee system.  See id. at 823-28.  The University of Virginia refused to fund the printing costs of a religious student journal, however, because the publication "'primarily promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality."  Id. at 823.  The Rosenberger plaintiffs alleged that this was viewpoint discrimination.  As in Southworth, the Court evaluated the plaintiffs' claims under its public forum cases, recognizing that a student fee system "is a forum more in a metaphysical than in a spatial or geographic sense, but the same [public forum] principles are applicable."  Id. at 830.  The Court then analyzed the plaintiffs' claims under the level of scrutiny applicable to limited public forums.[7]

---

[6]Viewpoint neutrality became an issue on remand.  See Southworth II, 307 F.3d at 568.

[7]The Supreme Court's public forum cases deal with a range of forums, from "traditional public forums" to "nonpublic forums," and the level of scrutiny applicable to the government's actions in each type of forum varies.  See, e.g., Christian Legal Soc'y v. Walker, 453 F.3d 853, 865-66 (7th Cir. 2006).  In the present case, however, I need not discuss this body of law comprehensively.  Rather, I will focus on the "limited public forum," the type of forum at issue in Southworth and Rosenberger.  I note, however, that neither Southworth nor Rosenberger prevents a university from opening a metaphysical forum that is not a limited public forum.

In a limited public forum, "[t]he necessities of confining a forum to the limited and legitimate purposes for which it was created may justify the State in reserving it for certain groups or for the discussion of certain topics." Id. at 829 (citing Cornelius v. NAACP Legal Defense & Educ. Fund, Inc., 473 U.S. 788, 806 (1985); Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 49 (1983)).  Once it has opened a limited public forum, however, "[t]he State may not exclude speech where its distinction is not 'reasonable in light of the purpose served by the forum.'" Id.  Nor may the state "discriminate against speech on the basis of its viewpoint." Id.  Thus,

> in determining whether the State is acting to preserve the limits of the forum it has created so that the exclusion of a class of speech is legitimate, [the Court has] observed a distinction between, on the one hand, content discrimination, which may be permissible if it preserves the purposes of that limited forum, and on the other hand, viewpoint discrimination, which is presumed impermissible when directed against speech otherwise within the forum's limitations.

Id. at 829-30.  The Court ultimately concluded that the University of Virginia's decision to pay the printing costs of secular student newspapers but not student newspapers with a religious perspective constituted viewpoint discrimination.  Id. at 837.  It then addressed whether the University of Virginia's interest in not violating the Establishment Clause justified such discrimination, a topic I discuss in more detail in the next section.

In summary, the Supreme Court's cases establish that:  (1) when a public university uses mandatory student fees to create a metaphysical forum, it must satisfy the requirements set forth in the Court's public forum cases; (2) usually (but not necessarily), a metaphysical forum will be evaluated under the level of scrutiny applicable to limited public forums; (3) the funds collected through a system of segregated fees that establish

11

a limited public forum must be distributed on a viewpoint neutral basis; and (4) any content-based distinctions in a metaphysical, limited public forum must be reasonable in light of the purposes of the forum.

### 2.   Establishment Clause

Because the University relies so heavily on the Establishment Clause, I will discuss it before applying the public forum principles discussed above.  The University maintains that it cannot fund worship, proselytizing or sectarian religious instruction out of segregated fees without unconstitutionally supporting religion.  However, a state does not violate the Establishment Clause by affording religion the same access to a public forum that it grants to non-religious groups.  Good News Club v. Milford Cent. Sch., 533 U.S. 98, 112-19 (2001); Rosenberger, 515 U.S. at 837-46; Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761-63 (1995); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 390-97 (1993); Widmar v. Vincent, 454 U.S. 263, 270-276 (1981).  Although the Supreme Court's Establishment Clause jurisprudence is not always clear, in the public forum context, the Court has focused on governmental neutrality.  Good News Club, 533 U.S. at 114; Rosenberger, 515 U.S. at 839.  Further, it has held that "the 'guarantee of neutrality is respected, not offended, when the government, following neutral criteria and evenhanded policies, extends benefits to recipients whose ideologies and viewpoints, including religious ones, are broad and diverse.'"  Good News Club, 533 U.S. at 114 (quoting Rosenberger, 515 U.S. at 839).

"More than once" the Court has "rejected the position that the Establishment Clause even justifies, much less requires, a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design."

12

Rosenberger, 515 U.S. at 839.  This is so even when the religious speakers seek to use the forum "for sectarian activities, accompanied by some devotional exercises."  Id. at 842. Indeed, in Widmar, the Court held that the Establishment Clause did not allow the government to prohibit a student group from using a public forum "for religious worship and religious discussion," including "prayer, hymns, Bible commentary, and discussion of religious views and experiences."  454 U.S. at 265 & n.2.  Thus, in the present case, the University may grant religious student groups access to its segregated fee forum on the same basis as non-religious student groups, even if some of the groups' activities could be characterized as worship, proselytizing or sectarian religious instruction.

The University makes two arguments in support of the proposition that the Establishment Clause compels it to withhold segregated fee funding for worship, proselytizing, and sectarian instruction.  First, it contends that the Court has drawn a line between religious speech and religious expression amounting to worship, proselytizing and sectarian instruction, and that it allows only the former in a public forum.  However, this argument relies principally on dissenting opinions in the cases cited above.  As discussed, the controlling opinions hold that the government does not violate the Establishment Clause when it grants religious groups equal access to a public forum, even when the religious activity could be described as worship.  See, e.g., Widmar, 454 U.S. at 265 & n.2.

On this point, I note also that it is sometimes difficult to distinguish between speech from a religious viewpoint and worship, proselytizing or sectarian instruction.  Religious speech sometimes proselytizes, and elements of worship sometimes pervade religious discussions.  "There is 'no simple and clear measure which by precise application can readily and invariably demark the permissible from the impermissible,'" and thus the Court

13

"has found no single mechanical formula that can accurately draw the line in every case." Van Orden v. Perry, 545 U.S. 677, 698-99 (2005) (Breyer, J., concurring) (quoting Sch. Dist. of Abington Twp. v. Schempp, 374 U.S. 203, 306 (1963) (concurring opinion)). Justice Breyer's comment concerned formulating a test governing Establishment Clause cases, but it applies equally to the University's attempt to draw a line between permissible and impermissible religious speech. Likewise, the Supreme Court has explained that the Establishment Clause does not require governmental officials to "scrutinize the content of student speech, lest the expression in question . . . contain too great a religious content." Rosenberger, 515 U.S. at 844. As discussed in more detail in the next section, instead of attempting to draw lines at a relatively high level of generality, the University should focus on evaluating every proposed use of segregated fees individually in light of the purposes of the forum. If a use that could reasonably be labeled worship or proselytizing nonetheless satisfies the forum's neutral criteria, the Establishment Clause will not justify its exclusion from the forum.

Second, the University argues that funding religious activities with segregated fees would create the appearance that the state endorses a religious message, and unlike Zelman v. Simmons-Harris, 536 U.S. 639 (2002), there would be no private choice "circuit breaker" between the flow of funds from the state treasury to religious activity.[8] However, Zelman was not a public forum case. In a public forum, governmental neutrality towards religion removes the possibility that by granting a religious organization access to the

---

[8]In Zelman, the Court upheld against an Establishment Clause challenge Ohio's school voucher program, which allowed parents to use state funds to pay parochial school tuition if they chose to send their children to parochial rather than public school.

14

forum, the government will be perceived to be endorsing a religious message. Thus, when a forum is "open to a broad spectrum of groups," granting religion equal access to the forum provides "only incidental benefit to religion." Pinette, 515 U.S. at 763. Similarly, "an open forum in a public university does not confer any imprimatur of state approval on religious sects or practices." Widmar, 454 U.S. at 274. As in cases such as Good News Club, Rosenberger, Pinette, Lamb's Chapel, and Widmar, the admission of religion into the University's public forum does not create the appearance that the state endorses the religious messages expressed. No reasonable observer would think that the University has shown a preference for religion by funding student religious activity along with a wide array of other student activity, so long as the religious activity serves the purposes of the forum.[9]

Thus, I conclude that the Establishment Clause does not compel the University to categorically exclude worship, proselytizing or sectarian religious instruction from its segregated fee forum. However, as explained in the next section, nothing in the Constitution requires the University to fund all such activities.

---

[9]Under different facts, a public university's funding of religious activity could violate the Establishment Clause. For instance, if a public university opened a metaphysical public forum solely because it wanted to fund religious institutions with state tax dollars, it would likely violate the Establishment Clause because its predominant purpose would be to advance religion. See McCreary County v. Am. Civil Liberties Union, 545 U.S. 844, 859-66 (2005) ("When the government acts with the ostensible and predominant purpose of advancing religion, it violates the Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides."). In the present case, however, the University opened the segregated fee forum for secular reasons.

3.    **The University May Adopt Reasonable Content-Based Restrictions to Govern Its Limited Public Forum, Provided that Such Restrictions are Viewpoint Neutral**

Although the Establishment Clause neither compels nor authorizes the University to categorically exclude worship, proselytizing and sectarian religious instruction from access to segregated fees, the University may nevertheless be able to exclude some or all of the activities to which it objects.  The University need not open its forum to every conceivable student activity.  As the Southworth Court noted, the University "is free to enact viewpoint neutral rules [restricting access to segregated fees], for it may create what is tantamount to a limited public forum if the principles of viewpoint neutrality are respected."  529 U.S. at 234.  Although Southworth does not explicitly require anything other than viewpoint neutrality when choosing among proposed forms of expression, implicit in the Court's use of the phrase "tantamount to a limited public forum" is the additional requirement that any content-based restrictions on speech be reasonable in light of the purposes of the forum.  See, e.g., Good News Club, 533 U.S. at 106-07.

In the present case, in addition to its Establishment Clause concern, the University suggests that it will not fund worship, proselytizing or sectarian religious instruction because these activities are outside the purposes of its forum.  The University describes its purposes as follows:

> Although the [U]niversity's financially-supported program to facilitate extracurricular student speech is distinguished . . . by its vast unexplored bounds, the purpose of the forum is not completely unlimited. . . . [T]he University's reason for imposing the segregated fee in the first instance [was] to foster vibrant campus debate among students.  The [U]niversity has imposed the mandatory fee system to sustain an open dialogue for the purpose of ensuring that students have the means to engage in dynamic discussions of philosophical, religious, scientific, social, and political subjects

16

in their extracurricular campus life outside the lecture hall.  The expenditure of segregated university fees to foster expressive activity that is "debate" and "dialogue" and "discussions of philosophical, religious, scientific, social, and political subjects" is related to and consistent with the [U]niversity's mission to "discover and disseminate knowledge" and to "stimulate society by developing in students heightened intellectual, cultural and humane sensitivities."  However, speech that is not "dialogue," or "discussion," or "debate" is not within the boundaries of the program of financially-supported student expression that the [U]niversity created.

(Defs.' Br. in Opp'n at 14 (internal quotation marks and citations omitted, emphasis in original).)  In short, the University states that activities which are not "dialogue," "discussion" or "debate" are outside the forum's limited purposes.

However, the University makes this argument at an overly abstract level.  It does not define dialogue, discussion or debate, stating only that "religious expression that is speech about a particular topic from a religious point of view" is within the purposes of the forum, but that "religious expression that is or amounts to worship and religious expression that is aimed principally at proselytizing or inculcating belief in a specific faith" is not.  (Id. at 15.) Later, it adds that "[w]orship is not a dynamic discussion between students; nor is such dynamic discussion present in the inculcation of belief in a particular faith," (id. at 27), and that "given the close relationship between proselytizing – the attempt to induce another to convert to one's faith – and the inculcation of a particular faith's religious beliefs, proselytizing is likewise a non-essential component of the system that gives students the means to engage in dynamic discussions."  (Id.)

The problem with the University's argument is that the issue in the present case is not whether activities that could reasonably be labeled worship, proselytizing or sectarian religious instruction serve the forum's limited purposes, but whether the specific activities that RCF actually engaged in serve such purposes.  The labels affixed to an activity are not

17

necessarily dispositive of whether the activity serves the forum's purposes, especially when the labels are broad, as are labels such as worship, proselytizing, inculcation, dialogue, discussion and debate.  Rather than relying on highly abstract labels, the University must examine the specific content of each disputed activity in light of the forum's purposes. Further, worship, proselytizing and sectarian religious instruction, and dialogue, discussion and debate, are not mutually exclusive.  An activity can integrate elements of worship and discussion, proselytizing and debate, and instruction and dialogue.  An activity that includes some worship cannot be excluded on the ground that it is not "dialogue, discussion or debate" if that activity in fact includes some dialogue, discussion, or debate.  In short, before excluding an activity from the segregated fee forum pursuant to a content-based distinction, the University must explain specifically why that particular activity, viewed as a whole, is outside the forum's purposes.

I note also that in deciding how to best utilize a finite amount of segregated fees, the University will inevitably have to make funding decisions that depend on value judgments that cannot be explained with absolute precision.  It cannot fund all activities that serve the intentionally broad purposes of the forum, and thus it will have to decline to fund some activities that might in some sense do so.  In deciding whether to fund an activity, the University is entitled to assess the <u>degree</u> to which the activity would further the purposes of the forum.  Thus, although two activities might serve the forum's purposes, the University may conclude that one would make a better contribution and fund only it.  <u>Cf.</u> <u>Widmar</u>, 454 U.S. at 278-81 (Stevens, J., concurring) (explaining that university officials should be afforded some latitude when determining how best to allocate extracurricular resources). However, because it may not make completely arbitrary decisions or engage in viewpoint

18

discrimination, the University will have to explain its choice.  But because all value judgments contain some element of subjectivity, the University's explanation may also be somewhat subjective.  As long as it states the reason for its decision as objectively as possible and applies it consistently among all viewpoints, the University will not violate its students' rights.[10]

For example, the University may decline to fund an RCF activity because it decides that while worship may technically be within the forum's broad purposes, its value to the forum is less than other forms of expression.  However, to do so without being legally vulnerable, the University cannot just affix the label "worship" to the activity but must explain the reasoning underlying its decision.  The reasoning might be that activities involving little more than an assembly of students who offer praise to a person, object or idea are less valuable to the forum than an assembly of students who engage in the back-and-forth discussion of an idea.  Thus, the University may decline to fund activities involving nothing more than mechanical praise,[11] provided that it does not simultaneously fund secular activities that lack a discussion component.  Alternatively, the University might conclude that students who wish to worship can do so by attending a local church and that it will

---

[10]The University must of course evaluate activities pursuant to clear standards in order to minimize self-censorship and post-hoc rationalizations that serve to mask viewpoint discrimination.  See Southworth II, 307 F.3d at 575-92.  However, it cannot possibly be expected to write down ahead of time every legitimate reason that it might have for funding one activity over another.  Thus, the University is entitled to exercise "a certain amount of discretion," so long as that discretion is "no greater than necessary to allow the [University] to evaluate the funding requests."  Id. at 592.

[11]RCF's proposed activities appear to involve more than mechanical praise.  They seem to integrate elements of worship and discussion.  This is why the University's blanket characterization of them as worship is not an adequate reason for excluding them from the forum.

19

reserve segregated fees for activities that, but for the forum, would be unavailable to students, such as programs discussing "sustainable agriculture and food systems within the University and beyond."   (PFOF ¶ 441 (description of "F.H. King Students of Sustainable Agriculture" student organization).)[12]

If the University decided that activities involving proselytizing or sectarian religious instruction did not best serve the forum's purposes, it would similarly have to explain those decisions.   Given the breadth of the segregated fee forum, the University might have difficulty finding a viewpoint neutral reason for excluding religious proselytizing. Proselytizing is essentially advocacy from a religious viewpoint.  If the University excluded all advocacy from the forum, perhaps it could also exclude religious proselytizing.  But so long as it funds political, environmental and other advocacy, it is hard to see a viewpoint neutral reason for excluding religious advocacy, although I do not foreclose the possibility that one exists.[13]   As for religious instruction, as long as the University uses segregated fees for instruction on secular topics, it must exercise caution before excluding instruction on religious topics.  However, the University may limit the kind of instruction that it will fund.

_____

[12]Relatedly, the University could refuse to fund certain activities on the basis of cost. For instance, RCF's Samuel Group program involved flying nuns to Madison from Italy so that the nuns could discuss RCF members' paths in life.  (PFOF ¶ 459.)  It is unclear whether segregated fees would have paid the nuns' travel expenses, but if so, the University could have refused to pay such an extraordinary expense unless RCF demonstrated an extraordinary justification.

[13]Certainly the University could not exclude proselytizing on the ground that it is controversial and might generate student objections.  The very rationale of Southworth is that before the University can compel students to fund objectionable speech, it must be willing to fund objectionable speech from all viewpoints.  529 U.S. at 232 ("It is all but inevitable that the fees will result in subsidies to speech which some students find objectionable.").

For example, the University might decide to fund only instructional activities in which the students provide a majority of the instruction.  Thus, it could deny a request to hire ordained clergy to provide religious instruction.  Again, the key is that the University make a judgment about what kinds of activities it will fund, apply that judgment consistently, and not deny funding for religious activities if it funds secular activities of a similar nature.[14]

Finally, the University must evaluate an activity as a whole and not focus only on its possibly objectionable components.  Thus, if the University provides a good reason for excluding mechanical worship from its forum, it should deny funding for an organization's activity only if a considerable percentage of the activity involves such worship.  For example, the University denied RCF's request for funding for its Evangelical Catholic Summer Camp because the program incorporated "three masses and four communal prayer and worship programs into the program's 96-hour duration."  (PFOF ¶ 455.) However, the University acknowledges that the activity predominantly involved training for RCF's student-leaders.  (Id.)  Thus, assuming that the University funds other student leadership retreats, it may not disqualify RCF's retreat simply because it integrates some worship.  If, on the other hand, the University reasonably determines that the retreat predominantly involved worship rather than leadership training, it could decline to fund the activity on the ground that it is not within the purposes of the forum.  Here, the key is that

---

[14]I note that funding religious activities might pose an additional problem in light of the viewpoint neutrality requirement – namely, if a student group representing a particular religion gains access to segregated fees, groups representing other religions might also seek funding, which could lead to religious groups consuming a disproportionate share of segregated fees.  However, preventing religion from dominating the forum would justify the University in making content-based distinctions.  While the University would have to be careful and avoid favoring one religion over another, the University could take reasonable measures to preserve the forum's diversity.

rather than categorically exclude activities which might contain elements that the University would not fund as freestanding events, the University must evaluate each activity as a whole in light of the purposes of the forum.

With the foregoing principles in mind, I turn to the RCF activities at issue in the present case.

### 4.    The University Has Not Shown that RCF's Activities Are Outside the Limited Purposes of the Forum

Plaintiffs argue that the University engaged in viewpoint discrimination by refusing to reimburse RCF for expenditures in its 2006-07 and 2007-08 budgets.[15]    Although plaintiffs frame their argument in terms of viewpoint discrimination, I find that plaintiffs' argument is better characterized as a claim that the University has made content-based distinctions that lack a reasonable basis.  It is undisputed that the University refused to fund the disputed activities based on the content of RCF's expression.  The only reasons that the University offers to support its content-based distinctions are (1) the Establishment Clause compels it to exclude the activities, and (2) the activities are outside the forum's purposes because they involve worship, proselytizing or sectarian religious instruction and therefore do not involve dialogue, discussion or debate.  As discussed above, however, the University would not violate the Establishment Clause if it funded the disputed activities as part of a limited public forum.  As also discussed, the University's abstract characterization of the activities as something other than dialogue, discussion or debate simply because

---

[15]Recall that the University reimburses student organizations for budgeted expenditures and does not disburse funds until after the organization incurs the expense. In the present case, RCF paid for the disputed activities, and the University declined to reimburse it.

they could also be characterized as worship, proselytizing or sectarian religious instruction is an insufficient basis for excluding them from the forum.  Accordingly, I conclude that the University's refusal to fund the activities in question was not reasonable in light of the purposes of the forum.[16]

Having decided that the University's content-based exclusion of RCF's activities was unreasonable, I need not determine whether the exclusion also constituted viewpoint discrimination.  However, I seriously doubt that the University's conduct could be fairly characterized as viewpoint discrimination.  Professor Smolla explains the difference between content and viewpoint discrimination as follows:

> A content-based regulation either explicitly or implicitly presumes to regulate speech on the basis of the substance of the message.  A viewpoint-based law goes beyond mere content-based discrimination and regulates speech based upon agreement or disagreement with the particular position the speaker wishes to express.  Viewpoint discrimination is a subset of content discrimination, but not all content discrimination is viewpoint discrimination.  Viewpoint discrimination is thus an especially egregious form of content discrimination in which the government targets not just subject matter, but the particular views taken on subjects by speakers.

1 Rodney A. Smolla, Smolla & Nimmer on Freedom of Speech § 3:9, at p.3-12.5 (2007).

Similarly, courts have observed that "[c]ontent refers to the topic or matter treated in a

---

[16]As noted, the University relies on its Establishment Clause argument and makes little effort to explain why the disputed activities do not serve its forum's purposes.  I emphasize, however, that nothing in the present decision should be interpreted to preclude the University from refusing to fund the activities presently under review if in future academic years the University advances better reasons for doing so.  In the present decision, I do no more than reject the University's Establishment Clause rationale and its categorical exclusion of all activities that in any way involve worship, proselytizing or sectarian religious instruction.

particular work.  Viewpoint refers to one's opinion, judgment or position on that topic."  Id. at p. 3-13 (quoting Amato v. Wilentz, 753 F. Supp. 543, 553 (D.N.J. 1990)).[17]

Plaintiffs have identified no topic on which the University has excluded religious viewpoints.  They have not shown, for example, that the University funds secular speech about abortion and birth control but prohibits RCF from expressing a Catholic perspective on these topics.  Nor have plaintiffs shown that the University funds some worship but not RCF's or that it regulates RCF's speech because of "the specific motivating ideology or the opinion or perspective of the speaker."  Rosenberger, 515 U.S. at 829.  In fact, the University funds a considerable amount of RCF's religious speech, which shows that the University is not attempting to exclude religious viewpoints from its forum.  Thus, I conclude that it would likely be inaccurate to describe the University's actions in the present case as viewpoint discrimination.

## B.    Criterion C

Plaintiffs also argue that Criterion C, which contains some of the GSSF eligibility criteria, is unconstitutionally vague because it vests student government and University officials with unbridled discretion to determine whether a student organization can receive GSSF funding.[18]  In Southworth II, the Seventh Circuit held that if University officials had unbridled discretion to determine which groups would be eligible for funding, the segregated

---

[17]I also note, however, that the line between content- and viewpoint-based distinctions is not always clear.  See 1 Smolla, supra, § 3:9, at 3-13.

[18]As indicated, the GSSF eligibility criteria govern whether a student organization is entitled to draw funding from segregated fees, not whether any specific activity in which the organization engages will be funded.  Once an organization is GSSF-eligible, it can propose a budget and be reimbursed for approved expenditures.

fee system would not be viewpoint neutral.  307 F.3d at 575-92.  Granting government officials unbridled discretion to determine who may speak in a public forum presents two risks to free expression – the risk of self-censorship and the risk that the official will suppress speech.  Id. at 576-77.  Speakers may restrict their own speech to avoid encountering the government's discretion, and the absence of standards makes it difficult to distinguish between a legitimate restriction of speech and viewpoint discrimination.

The University applied two versions of Criterion C to RCF's request for GSSF eligibility for the 2008-09 academic year.  Although the student government struggled to interpret both versions, ultimately the Chancellor found that RCF satisfied the eligibility criteria.  Further, the University no longer applies either version of Criterion C.  Thus, plaintiff's challenge to Criterion C would appear to be moot.  Plaintiffs, however, dispute this on two grounds.  First, they invoke the voluntary cessation exception to mootness doctrine, pursuant to which voluntary cessation of challenged conduct will be deemed to moot an action only if it is absolutely clear the conduct is unlikely to recur.  See, e.g., Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000).  Plaintiffs argue that by declaring RCF eligible for funding and withdrawing earlier versions of Criterion C, the University voluntarily ceased to engage in the conduct at issue but that it may well resume such conduct in the future.  However, when a governmental body corrects its own conduct, the opposing party cannot escape application of the mootness doctrine unless it shows that the government likely made the correction in bad faith and solely to moot the controversy while harboring a secret intent to resume its old ways.  Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago, 326 F.3d 924, 929-31 (7th Cir. 2003); Magnuson v. City of Hickory Hills, 933 F.2d 562, 565 (7th Cir. 1991); Ragsdale v. Turnock, 841 F.2d 1358, 1365 (7th

Cir. 1988).  In the present case, plaintiffs present no evidence that the University acted in bad faith or that it intends to resurrect Criterion C.  Thus, the voluntary cessation doctrine is inapplicable.

Second, plaintiffs argue that this claim is not moot because they seek damages for injury suffered while Criterion C was in effect.  But because the Chancellor found RCF eligible for funding, the only compensation that plaintiffs seek is for the "countless hours [devoted] to appeals and hearings" before the student government and University officials during the GSSF eligibility process.  (Reply Br. at 47.)  Essentially, plaintiffs argue that they are entitled to damages for having to use the very appeals procedure that the University established to prevent unconstitutional determinations.  See Southworth II, 307 F.3d at 591 (noting that the "appeals process operates as a further protection" against unbridled discretion and viewpoint discrimination).  However, plaintiffs can obtain damages only for the deprivation of a constitutional right.  Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986).  In the present case, having to use the University's appeals process was not itself a violation of plaintiffs' constitutional rights.  Moreover, while it was in effect, Criterion C did not prevent plaintiffs from exercising their First Amendment rights.  Plaintiffs appealed the adverse decisions made under Criterion C during the 2007-08 academic year, during which time RCF's 2007-08 budget, which was already approved and in effect, would have funded any of RCF's expressive activities.  The decisions that the University made pursuant to Criterion C affected only plaintiffs' 2008-09 budget.  And because the Chancellor granted GSSF eligibility to RCF prior to the start of the 2008-09 academic year, Criterion C stifled none of plaintiffs' speech.  Thus, Criterion C did not deprive plaintiffs of any constitutional right, and it caused them no damages that are recoverable under § 1983.

Accordingly, I will dismiss plaintiffs' claims involving Criterion C as moot.

**C.     Remedy**

Plaintiffs seek numerous forms of relief.  First, they ask me to make permanent  the preliminary injunction requiring the University to fund worship, proselytizing and sectarian instruction.  Second, they seek a declaratory judgment to the same effect.  Third, they ask me to require the University to reimburse RCF for the unreimbursed 2006-07 and 2007-08 expenditures.  Fourth, they seek an order requiring the University to refund the payments that the student-plaintiffs made to the segregated fee account during the 2006-07 and 2007-08 academic years.  Fifth, they demand $300,000 in punitive damages.  Finally, they request costs and attorneys' fees.

**1.     Injunctive and Declaratory Relief Regarding University's Refusal to Fund Worship, Proselytizing and Sectarian Instruction**

Primarily, plaintiffs seek to permanently enjoin the University from excluding worship, proselytizing and sectarian religious instruction from the segregated fee forum.  "According to well-established principles of equity, a plaintiff seeking a permanent injunction must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006); e360 Insight v. The Spamhaus Project, 500 F.3d 594, 604 (7th Cir. 2007).

As discussed, the Establishment Clause does not require or authorize the University to categorically exclude worship, proselytizing or sectarian religious instruction from access

to segregated fees.  However, neither does the Free Speech Clause compel it to fund them.  Rather, the University may adopt reasonable, content-based restrictions that reserve segregated fee funding for those activities that in its judgment best serve the forum's limited purposes.  In the present case, the University has not established any reason that justified its exclusion of RCF's activities in 2006-07 and 2007-08.  However, as discussed, the University does not have to fund all future activities involving worship, proselytizing or sectarian instruction.  Rather, it must review each activity in light of the purposes of the forum, and if an activity that includes, for example, worship serves the forum's purposes, the University may not decline to fund it simply because it integrates some worship. However, if an activity that includes worship does not serve the forum's purposes and the University explains why not with specificity, the University may justifiably exclude it.

Because labels are unhelpful and the University's future funding decisions must be made on a case-by-case basis, I find that it would not be in the public interest to enter a permanent injunction that compels the University to fund, or prohibits the University from refusing to fund, any particular category of activity.  Perhaps I could enjoin the University from maintaining a policy that categorically excludes any activity involving worship, proselytizing or sectarian religious instruction, but again the meaning of these terms will not always be clear.  Such an order could well cause the University to fund an activity rather than risk contempt sanctions, even though the University might have legitimate reasons for excluding it.  A remedy that better balances plaintiffs' First Amendment interests against the University's need to make funding decisions is a declaratory judgment stating that the University may not categorically exclude worship, proselytizing or sectarian instruction from segregated fee funding unless it does so pursuant to a rationale that is reasonable in light

28

of the purposes of the forum and viewpoint neutral.  Such a judgment will protect plaintiffs who, in the event that the University refuses to fund RCF's activities without giving better reasons than it has in the present case, may return to court and enforce the declaratory judgment by seeking an injunction to compel funding of whatever specific activities are at issue and/or damages.  At the same time, a declaratory judgment is a less draconian remedy and affords the University greater latitude in evaluating future funding requests.

Based on the foregoing, I will dissolve the preliminary injunction.

### 2.    Monetary Relief

Plaintiffs also request monetary relief to compensate them for RCF's non-reimbursed 2006-07 and 2007-08 expenditures, as well as a refund of the segregated fee payments made by the student-plaintiffs during the 2006-07 and 2007-08 academic years.  Before plaintiffs may obtain monetary relief against governmental officials, however, they must overcome several hurdles.

First, although plaintiffs sue defendants in their official and personal capacities, plaintiffs cannot obtain relief against defendants in their official capacities.  This is so because suits against defendants in their official capacities are no different than suits against the state, Kentucky v. Graham, 473 U.S. 159, 165-68 (1985), and states are not liable for damages under § 1983, Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989).  While § 1983 allows plaintiffs to obtain damages against defendants in their personal capacities, plaintiffs must first show that each defendant personally played a role in depriving them of a constitutional right.  Graham, 473 U.S. at 166.  In the present case, the parties draw no distinctions between the individual defendants; thus, I assume that each defendant personally participated in the deprivation of plaintiffs' First Amendment

rights by discriminating against the content of their speech without a reasonable justification.

Second, as for plaintiffs' claim for damages against defendants in their personal capacities, defendants assert qualified immunity.  Id. at 166-67.  Governmental officials performing discretionary functions are immune from liability for damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity "gives public officials the benefit of the legal doubts" when they make official decisions.  Elliott v. Thomas, 937 F.2d 338, 341 (7th Cir. 1991).  All officials, save the "plainly incompetent or those who knowingly violate the law" are protected by qualified immunity.  Malley v. Briggs, 475 U.S. 335, 341 (1986).

In the present case, I conclude that defendants are entitled to qualified immunity. The Supreme Court has clearly established two relevant principles.  The first is that the Establishment Clause does not justify or require "a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design."  Rosenberger, 515 U.S. at 839.  The second is that any content-based exclusions from a limited public forum must be reasonable in light of the purposes of the forum.  In applying these principles to the present case, I conclude that the University should not have excluded the RCF activities that it labeled worship, proselytizing or sectarian religious instruction.  However, a university administrator could have reasonably applied these principles and concluded that the Establishment Clause required the exclusion of RCF's activities, especially when one considers some of the language that the Supreme Court used in Rosenberger.

30

Recall that in <u>Rosenberger</u>, the Court held that a university would not violate the Establishment Clause if it paid the printing costs of a religious student newspaper pursuant to a university policy of using student fees to subsidize student printing expenses.  The Court concluded that a university does not violate the Establishment Clause when it "pay[s] for a service" that is "used by a group for sectarian purposes" pursuant to a religion-neutral program.  515 U.S. at 843.  As discussed, I conclude that this principle, when combined with the Court's recognition in cases such as <u>Widmar</u> that the government must grant religious worship equal access to a public forum, means that the University would not violate the Establishment Clause if it funded RCF's worship, proselytizing and sectarian religious instruction along with a wide array of other student activities.  <u>Rosenberger</u>, however, adds the following language:  "We do not confront a case where, even under a neutral program that includes nonsectarian recipients, the government is making direct money payments to an institution or group that is engaged in religious activity."  <u>Id.</u> at 842. <u>Rosenberger</u> also states that "[i]t is, of course, true that if a State pays a church's bills it is subsidizing it, and we must guard against this abuse."  <u>Id.</u> at 844.

A university administrator could have reasonably thought that if the University reimbursed RCF's worship, proselytizing and sectarian religious instruction, it would be "making direct money payments to an institution or group that is engaged in religious activity," and "pay[ing] a church's bills."  This is especially true given that until UWRCF reorganized itself to qualify as an RSO, it was heavily influenced, if not controlled, by religious officials affiliated with the Roman Catholic Church.  (<u>See</u> PFOF ¶¶ 466-491 (describing the relationship between RCF and St. Paul's University Catholic Center).) Thus, a reasonable university administrator could have read <u>Rosenberger</u> as requiring the

31

exclusion of the RCF activities involving worship, proselytizing or sectarian religious instruction.

Moreover, my conclusion that the Establishment Clause does not justify or require the exclusion of RCF's activities is an application of the above principles to a new set of facts. Although cases such as Widmar hold that even sectarian religious activities such as worship are entitled to equal access to a public forum, those were cases involving "brick and mortar" public forums, not the metaphysical forums at issue in Rosenberger and the present case. And while Rosenberger cautions against reliance on the distinction between "spending money" and the use of physical facilities, 515 U.S. at 843, Rosenberger involved only a discrete expenditure (printing costs), whereas the funding at issue in the present case is much broader, encompassing as it does the entire universe of student extracurricular activity. A reasonable university administrator could have determined that although Rosenberger permits universities to reimburse religious student groups for discrete expenses incurred by all student journals, it does not allow universities to fund unique sectarian activities that have no secular equivalents, such as RCF's Alpha-Omega events. Funding the latter types of events resembles "pay[ing] a church's bills" to a much greater extent than does paying a religious student newspaper's printing costs along with the printing costs of secular papers, or so a reasonable university administrator could think. Thus, while I conclude that the University may fund RCF's unique sectarian activities when it also funds the unique activities of a wide range of secular student groups, my conclusion nudges the boundaries of clearly established law. Accordingly, defendants are entitled to qualified immunity, and I will deny plaintiffs' demand for monetary relief pursuant to § 1983.

### 3.    Punitive Damages

Plaintiffs have requested punitive damages but make no detailed arguments in support of this demand.  Punitive damages are available under § 1983 only "'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Alexander v. City of Milwaukee, 474 F.3d 437, 453 (7th Cir. 2007) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).  Plaintiffs present no evidence even remotely suggesting that plaintiffs acted with such a state of mind.  Therefore, I decline to award punitive damages.

### 4.    Attorneys' Fees

Finally, plaintiffs demand attorneys fees pursuant to 42 U.S.C. § 1988, which instructs courts to award attorneys' fees to prevailing parties in § 1983 litigation.  The parties have not yet briefed whether plaintiffs are "prevailing parties" within the meaning of § 1988, and therefore I will address this matter in future proceedings.

## D.    State Law Claims

Plaintiffs also argue that the University's refusal to reimburse RCF for its 2006-07 and 2007-08 expenditures constitutes breach of the settlement agreement and that the state law doctrine of promissory estoppel requires reimbursement.  However, these claims fail because plaintiffs have not complied with Wisconsin's notice of claim statutes.

Although Wisconsin allows plaintiffs to sue the state and state officials in their official capacities for breach of contract, to do so, plaintiffs must first present their claims to the State legislature for payment, and only if the legislature denies their claim may they file a lawsuit.  See Wis. Stat. §§ 16.007 & 775.01; Brown v. State, 230 Wis. 2d 355, 367 (Ct.

33

App. 1999).  Here, plaintiffs concede that they did not comply with this procedure, which leaves only their personal capacity claims.

To bring a lawsuit against state officials in their personal capacities, however, plaintiffs must comply with Wis. Stat. § 893.82(3), which in relevant part provides:

> . . . [N]o civil action or civil proceeding may be brought against any state officer, employee or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employee's or agent's duties, . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action or civil proceeding, the claimant in the action or proceeding serves upon the attorney general written notice of a claim stating the time, date, location and the circumstances of the event giving rise to the claim for the injury, damage or death and the names of persons involved, including the name of the state officer, employee or agent involved.

Plaintiffs concede that they did not technically comply with this statute, but they argue that they should be excused from complying because they "have already fulfilled the policy purposes of the statute and can still comply with its technicalities."  (Reply Br. at 43.)  But the statute itself and the Wisconsin courts state that <u>strict</u> compliance is a condition precedent to filing a lawsuit against a state official.  <u>See</u> Wis. Stat. § 893.82(2m) (requiring strict compliance); <u>Newkirk v. Wis. Dep't of Transp.</u>, 228 Wis. 2d 830, 833 (Ct. App. 1999) (same); <u>Oney v. Schrauth</u>, 197 Wis. 2d 891, 904 (Ct. App. 1995) (same). Therefore, it is irrelevant that plaintiffs may have fulfilled the policy purposes of the statute or that they might still be able to comply with it.  The only relevant fact is that they have not yet strictly complied, and therefore plaintiffs' state law claims seeking monetary relief against defendants in their personal capacities must be dismissed.

Plaintiffs argue that the notice of claim statutes do not apply to their state law claims for equitable relief.  To the extent that plaintiff's seek prospective equitable relief, this is

34

true.  <u>Casteel v. McCaughtry</u>, 176 Wis. 2d 571, 584-86 (1993).  However, plaintiffs' request for prospective relief pursuant to their state law claims is identical to their request for prospective relief pursuant to their constitutional claims, and having already dealt with plaintiffs' request for prospective relief above, I will not separately discuss such request here.  To the extent that plaintiffs seek monetary relief and characterize that relief as equitable, the notice of claim statute still applies.  This is so because the notice of claim statute applies whenever a plaintiff seeks retrospective relief – i.e., relief for an injury or damage that occurred in the past – against state officials.  <u>Id.</u>  Here, plaintiffs' claims for reimbursement are claims seeking retrospective relief for injuries that occurred in the 2006-07 and 2007-08 academic years.  Therefore, they are barred by § 893.82(3).

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiffs' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** and that defendants' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART** in accordance with this decision.

**IT IS FURTHER ORDERED** that plaintiffs' motion to supplement the summary judgment record with newly-discovered evidence is **GRANTED**.

**IT IS FURTHER ORDERED** that a telephonic status conference will be held on **October 21, 2008 at 1:30 p.m.** to determine whether further proceedings are required or whether final judgment should be entered.  The court will initiate the call.

Dated at Milwaukee, Wisconsin this 24 day of September, 2008.


/s_____
LYNN ADELMAN
District Judge