# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

---

**ROMAN CATHOLIC FOUNDATION,**
**UW-MADISON, INC., et al.**
          **Plaintiffs,**

    **v.**                          **Case No. 07-C-0505**

**The Regents of the University of**
**Wisconsin System, DAVID G. WALSH,**
**et al.,**
          **Defendants.**

---

## DECISION AND ORDER

Plaintiff Roman Catholic Foundation, UW-Madison, Inc. ("RCF") and two of its student members, Elizabeth A. Planton and Elizabeth A. Czarnecki, brought this action against the Regents of the University of Wisconsin and various University officials ("the University") under 42 U.S.C. § 1983.[1]  Plaintiffs challenged the constitutionality of the University's refusal to fund certain activities out of the University of Wisconsin-Madison's segregated fee account, which funds a variety of student activities.  They argued that the refusal to fund activities involving "worship," "proselytizing" or "sectarian religious instruction" constituted viewpoint discrimination in violation of the First Amendment.  The University argued that the First Amendment's Establishment Clause required it to refuse to fund such activities.

---

[1]Although the parties and I refer to the defendants collectively as "the University," the University is not, as an entity, a defendant in this case.  The defendants are the state officials who participated in the decision to deny RCF's funding requests.

On September 24, 2008, I granted-in-part and denied-in-part plaintiffs' motion for summary judgment.  See Roman Catholic Foundation, UW-Madison, Inc. v. Regents of University of Wis., __ F. Supp. 2d __, 2008 WL 4378466 (W.D. Wis. Sept. 24, 2008).[2]  I found that by categorically refusing to fund activities that it labeled worship, proselytizing or sectarian religious instruction, the University unreasonably excluded activities based on their content from its segregated fee system, a limited public forum.  I expressed doubt that the University's policy constituted viewpoint as opposed to content-based discrimination. I concluded that the Establishment Clause did not compel the University to exclude plaintiffs' religious activities from the forum, and that it did not justify the University's unreasonable content-based discrimination.  Based on these conclusions, I granted plaintiffs' request for declaratory relief, stating that the University's policy violated the First Amendment.  However, I denied plaintiffs' request for monetary and injunctive relief and dissolved a preliminary injunction entered by the Honorable John C. Shabaz, who previously presided over the case.

On October 8, 2008, plaintiffs moved for reconsideration.  Although they agree with my determination that the University violated the First Amendment, they argue that (1) in granting a preliminary injunction, Judge Shabaz made rulings that are the "law of the case" and binding on me; (2) defendants are not entitled to qualified immunity and therefore are liable for monetary relief; (3) plaintiffs are entitled to a ruling on their Free Exercise and Equal Protection claims; and (4) plaintiffs are entitled to a permanent injunction.  Before I address these arguments, I note the somewhat unusual nature of plaintiffs' motion.

---

[2]Below, I will cite to my prior opinion as "Order" and give the memorandum opinion page numbers, not the Westlaw page numbers.

Although they won their case on the merits, plaintiffs disagree with my reasoning and seek different relief.  In particular, they object to my characterizing the University's policy as unreasonable content-based rather than viewpoint discrimination.  They further argue that the University may not engage in even reasonable content-based discrimination.  However, whether the University's policy is characterized as unreasonable content-based or viewpoint discrimination does not affect the outcome of the case.  Either way, the policy violates the First Amendment.  Whether or not the University may make reasonable content-based distinctions also does not affect the outcome of the case because here the content-based distinctions were <u>un</u>reasonable and therefore unconstitutional.

Furthermore, even if the University's policy is characterized as viewpoint discrimination, it would have no effect on the relief that plaintiffs would receive.  The reason plaintiffs cannot obtain monetary relief is because defendants are entitled to qualified immunity.[3]  The reason that defendants are entitled to qualified immunity is because their view that the Establishment Clause barred the University from funding worship, proselytizing and sectarian religious instruction was reasonable.  As I explain in more detail below, the Establishment Clause defense applies with equal force no matter how plaintiffs' free speech claim is characterized.  As I also discuss, the defense also applies to plaintiffs' Free Exercise and Equal Protection claims.  Finally, as I also explain below, a declaratory judgment is an adequate remedy and a permanent injunction is inappropriate.

---

[3] Plaintiffs cannot obtain monetary relief against defendants in their official capacities because state officials acting in such capacities are not liable for damages under 42 U.S.C. § 1983.  Thus, whether defendants are liable for monetary relief turns on whether they are liable in their individual capacities.  Such liability, in turn, depends on whether defendants are entitled to qualified immunity.

3

Thus, although plaintiffs raise a number of issues which are largely academic, in the interest of completeness, I will address their arguments, particularly insofar as they might affect the outcome of the case.

**1.      Law of the Case and Related Arguments**

Disagreeing with my view that the University engaged in unreasonable content-based discrimination rather than viewpoint discrimination, plaintiffs argue that pursuant to the law of the case doctrine, I am bound by Judge Shabaz's conclusion "that Rosenberger [v. Rector & Visitors of Univ. of Va., 515 U.S. 819 (1995),] controls this case and that the University discriminated against RCF due to its viewpoint." (Pls.' Mem. of Law in Supp. of Mot. for Recons. at 3.)   As indicated, however, whether the University's policy is characterized as unreasonable content-based or viewpoint discrimination does not affect the outcome of the case.  Either way, the University violated plaintiffs' First Amendment rights and plaintiffs receive the same relief.  Nonetheless, Judge Shabaz's view of the present case seriously differs from my own.  He regarded the case as indistinguishable from Rosenberger, while I consider it different enough to make the University's Establishment Clause defense reasonable.  Because my differences with Judge Shabaz on this point are relevant to whether defendants are entitled qualified immunity, I will explain them in some detail.

In summary, if Judge Shabaz meant that the present case was in all respects indistinguishable from Rosenberger, I believe that he was clearly wrong.[4]  See United

---

[4]To be fair to Judge Shabaz, he was concerned only with plaintiffs' request for a preliminary injunction and had no occasion to consider whether defendants were entitled to qualified immunity.  Had he considered Rosenberger in connection with plaintiffs' request for damages, he may well have concluded that the present case was sufficiently different

States v. Harris, 531 F.3d 507, 513 (7th Cir. 2008) (explaining that law of the case can be reconsidered for compelling reasons, such as clear error).  In my September 24 decision, I explained why under Rosenberger and other Supreme Court cases the University's policy against worship, proselytizing and sectarian religious instruction was unconstitutional. (Order at 8-12.)  I stated that these cases established the proposition that the government does not violate the Establishment Clause when it grants a religious organization equal access to a forum, even a "metaphysical" forum involving money, and even if the religious group seeks to use the forum for worship, proselytizing or other "core" religious activities. (Order at 12-15.)  However, in analyzing defendants' entitlement to qualified immunity, I found the present case different enough from Rosenberger to make reasonable defendants' belief that the Establishment Clause required the University to exclude worship, proselytizing and sectarian religious instruction from the segregated fee forum.  (Order at 29-32.)

Plaintiffs argue that Rosenberger is so similar to the present case that it compels the conclusion that defendants violated their clearly established rights.  However, as explained in my original order, Rosenberger is distinguishable because it involved university funding of a much narrower range of student activities.  Rosenberger involved only university reimbursement of the cost of printing a student journal.  Id. at 844. In contrast, the present case involves university funding of a wide range of student activities.  (See Pls.' Resp. to Prop. Finding of Fact ["PFOF"] ¶ 441 (describing the groups and activities funded with

---

from Rosenberger to support defendants' entitlement to qualified immunity. Accordingly, the law of the case doctrine may not apply at all.  Even if it does, however, for the reasons indicated above, I am not bound by Judge Shabaz's conclusions.

segregated fees).)  This difference in scope is important for qualified immunity purposes because in explaining why reimbursement of a religious student journal's printing costs did not violate the Establishment Clause, the Rosenberger Court emphasized the narrow scope of the printing program at issue.  515 U.S. at 842-44.  The Court explained that a university's payment of a religious student organization's printing costs was not meaningfully different from the university's purchasing its own printer and making it available to all student journals, whether religious or secular.  Id. at 843 ("There is no difference in logic or principle, and no difference of constitutional significance, between a school using its funds to operate a facility to which students have access, and a school paying a third-party contractor to operate the facility on its behalf.").  The Court also emphasized that "[p]rinting is a routine, secular, and recurring attribute of student life."  Id. at 844.  The Court concluded that because the scope of the University of Virginia's funding program was narrow and because the expense at issue was shared by all student journals, the university was not in danger of "paying a church's bills" or "subsidizing [a church]" in violation of the Establishment Clause.  Id.

In the present case, segregated fees pay for much more than services the University could have provided itself, and the expenses for which RCF seeks reimbursement are not expenses shared by all student organizations.  (See Order at 5-6.)  Some of the disputed RCF activities involve ordained clergy, and RCF seeks "payment for the services provided by . . . nuns and priests."  (PFOF ¶ 457 (description of Mentoring for Busy Students

6

program).)  Other activities involve prayer and worship. In their proposed findings of fact,

the parties describe the disputed activities as follows:[5]

- <u>Evangelical Catholic Summer Training Camp</u>.  The students at the July 27, 2007, meeting provided information about the August 2007 Evangelical Catholic Summer Training Camp. They described the program as an event mainly attended by UWRCF's or RCF's student coordinators, and noted that the program is essentially a retreat that serves as training for the organization's leaders. The materials submitted in support of RCF's payment request included the daily schedule which included three masses and four communal prayer and worship programs into the program's 96-hour duration. In addition, the chart of RCF programs, events, and services provided to the SSFC on February 21, 2008, represents that prayer, worship, and proselytizing are intended consequences of the Evangelical Catholic Summer Training Camp. John Koczela, a Dorm Intern who attended the program, concurred that worship and proselytizing are intended consequences of the program.  (PFOF ¶ 455.)

- <u>Alpha-Omega Program</u>.  For its Alpha-Omega program, UWRCF purchased a drum shield on April 11, 2007, and submitted the bill and payment justification to the Dean of Students' office for reimbursement. The justification indicated that the drum shield was to be used for the band that leads praise and worship weekly at each Alpha Omega event. At the July 27, 2007, meeting, the students confirmed that the band plays praise and worship music at the start and end of UWRCF's Alpha Omega meetings. The chart of RCF programs, events, and services provided to the SSFC on February 21, 2008, represents that worship is an intended consequence of the Alpha-Omega program.   Students familiar with the Alpha-Omega program concurred.  (PFOF ¶ 456.)

- <u>Mentoring for Busy Students</u>. At the July 27, 2007, meeting, the students stated that students participating in the Busy Person's Retreat (<u>i.e.</u>, Mentoring For Busy Students) met with one of the spiritual directors for spiritual mentoring/counseling and to talk about anything they wanted for a half-hour. The spiritual directors included Catholic nuns and priests who would offer guidance or prayer if requested by the student. UWRCF requested GSSF funding for payment for the services provided by the nuns and priests and for their meals. The supporting documentation submitted with the payment request identified prayer as an integral, not optional, component of the program and equal to the spiritual counseling component.

---

[5]The parties' descriptions of the activities at issue do not give a complete picture of each activity, and the parties dispute some of the details.  However, the undisputed facts are sufficient to demonstrate that RCF's activities included substantial prayer and worship components.

UWRCF sought reimbursement for 15 entertainment contracts ($1,500), parking ($175), food ($194.88), and advertising ($228.54).  (PFOF ¶ 457.)

- Samuel Group Program.  At the July 27, 2007, meeting, the students provided information about the Samuel Group program, which was an item in the 2007–08 budget. The students described the program as involving three Catholic nuns who travel from Italy to spend the school year in Madison to meet with participating students individually each month for a year in an effort to help the students look more closely at their path in the world. The students stated that the rules for participation in the program are very serious. The students acknowledged that the program incorporates instruction about the acceptable roles for Roman Catholics, spiritual guidance, prayer, and specific assistance in discerning their vocational role in the church.  Father Nielsen described the Samuel Group as a vocational discernment group, meaning discernment as to when a person is meant to be a priest, or religious, or to be married. The program brochure confirmed the students' description of the program.  (PFOF ¶ 459.)

- Evangelical Catholic Institute. At the July 27, 2007, meeting, the students described the 2007 Evangelical Catholic Institute as a primary training institute for their leaders to learn from the Catholic perspective how to talk to people about prayer, worship, and the Catholic faith. The request for reimbursement was for expenses UWRCF agreed to pay related to the program in lieu of registration fees for attendees. These expenses included printing of information about the Institute, UWRCF's portion of speaker fees for Cardinal Dulles and another speaker (Richard Cleveland), speaker airfare, lodging and food costs, and newspaper advertisements. . . . The schedule for the Evangelical Catholic Institute incorporated two masses and three praise and worship programs into the program's 48-hour duration. The program included a "Praise and Worship Clinic" to provide musicians, singers, and worship leaders with tools and experiences to bring vibrant praise and worship home to their ministry, a[n] "Evangelical Catholic Preaching Clinic", and a "Sharing the Good News Clinic" to provide attendees with effective ways to evangelize. The program also included numerous workshops providing instruction in effective techniques for Catholic proselytizing, the creation of small and large group Catholic ministries, and implementing evangelical Catholic campus ministries.  (PFOF ¶ 460.)

- Rosary Booklets.  The students at the July 27 meeting described the Rosary booklets as assisting students in learning more about the Rosary prayer itself as well as how to pray the Rosary. Lynch also reviewed UWRCF's purchase justification documents outlining the Rosary books and Rosary cards expense which noted that the pamphlet guides would be used in faith-sharing small groups to teach students how to pray the Rosary and learn more deeply this form of prayer.  (PFOF ¶ 462.)

8

Again, as I read Rosenberger and related cases, the involvement of clergy in and the substantial worship components of the activities in the present case did not require the University to exclude the activities from the segregated fee forum.  However, a reasonable University administrator (i.e., one who is not "plainly incompetent" or who does not "knowingly violate the law," Malley v. Briggs, 475 U.S. 335, 341 (1986)) could have concluded that the highly sectarian and unique aspects of RCF's activities brought them within Rosenberger's admonition that the state not "pay a church's bills" or "subsidize it." Indeed, in some respects, RCF resembles a student-run church.  In any event, the wide-ranging and highly sectarian funding requests at issue in the present case are a far cry from the discrete printing costs at issue in Rosenberger.  For this reason, I conclude that Rosenberger is not so similar to the present case that it deprives defendants of qualified immunity.   Reasonable university administrators could have concluded that the Establishment Clause prohibited the University from funding the RCF activities at issue.

Plaintiffs also argue that I am bound by Judge Shabaz's conclusion that the University's policy constitutes viewpoint discrimination rather than, as I concluded, unreasonable content-based discrimination.  As indicated, at this point in the case, the distinction is largely academic because however characterized, the University's policy is unconstitutional and defendants' entitlement to qualified immunity is unaffected.  But I reiterate that in my view, the University's policy is better characterized as unreasonable content-based rather than viewpoint discrimination.  (Order at 23-24.)  Plaintiffs do not identify any topic concerning which the University excluded a religious viewpoint.  They have not shown, for example, that the University funds secular speech about abortion and

9

birth control but prohibits RCF from expressing a Catholic perspective on these topics.[6]   Nor have plaintiffs shown that the University funds some worship but not RCF's.   In fact, the University funds a considerable amount of RCF's religious speech – including RCF's small and large group discussions about religion, educational and service offerings, theater and choral activities, and new-student and freshman welcoming activities (PFOF ¶ 465) – indicating that the University is not attempting to exclude religious or Catholic viewpoints from its forum.

In Rosenberger, the Court identified a specific viewpoint against which the University of Virginia discriminated – namely, a viewpoint that "'primarily promotes or manifests a particular belie[f] in or about a deity or ultimate reality.'" 515 U.S. at 822-23.   In the present case, I can identify no "viewpoint" embodied in plaintiffs' worship, proselytizing, and other sectarian activities.   Indeed, the labels "worship," "proselytizing" and "sectarian religious instruction" do little more than describe categories of expressive activity and do not themselves adumbrate a viewpoint.   Saying that discrimination against worship or proselytizing is viewpoint discrimination is like saying that discrimination against poems or newspapers is viewpoint discrimination.   Although it may be viewpoint discrimination to favor poems about love over poems about religion, or newspapers written from a secular

_____

[6]In their motion for reconsideration, plaintiffs attempt to show that the University has favored secular speech but discriminated against RCF's religious speech on the same topic. The example they use is leadership training: the University funded the leadership training retreats of secular groups but did not fund RCF's leadership retreat because it included worship as part of the program.  (Pls.' Mem. of Law in Supp. of Mot. for Recons. at 13.) However, the University did not discriminate against RCF because RCF intended to present a Catholic or religious viewpoint on the topic of leadership, but rather because RCF's leadership retreat incorporated prayer, masses, and other forms of worship.  Nothing in the record indicates that RCF's prayer, mass, or worship sessions dealt with the topic of leadership.

editorial viewpoint over those written from a religious editorial viewpoint, it seems like a misuse of the term "viewpoint discrimination" to describe discrimination against <u>all</u> poems or <u>all</u> newspapers as viewpoint discrimination.

Perhaps, however, the term "viewpoint discrimination" could be stretched to cover the University's policy against funding worship, proselytizing and sectarian religious instruction. As I noted in my September 24 decision and as the Seventh Circuit recently reiterated, "[d]istinguishing between a permissible content-based restriction and an impermissible viewpoint-based restriction is not always easy." <u>Choose Life Ill., Inc. v. White</u>, No. 07-1349, 2008 WL 4821759 (7th Cir. Nov. 7, 2008) (slip op. at 25). But again, the difference between content-based and viewpoint discrimination does not alter the outcome of the case, because the University's policy is unconstitutional under either characterization. The difference may well be relevant when the University evaluates future funding requests, but such requests are not now before me. If in the future the University denies funding to a religious student group pursuant to a reasonable content-based distinction, the affected student group will be able to litigate the question of whether the distinction also constitutes viewpoint discrimination. Such a case might present a better record from which to evaluate whether the distinction is based on viewpoint rather than just content. Indeed, once the University advances a permissible reason for engaging in content discrimination, it might be easier for a court to determine whether the discrimination is also viewpoint discrimination. The reason for the distinction itself might reveal whether it is viewpoint-based.

Plaintiffs also argue that the University should not be permitted to make <u>any</u> content-based distinctions, even reasonable ones, because it has created a designated

public forum, not simply a limited public forum.[7]  But once again, I have already found that the University's policy is unconstitutional, and it is unconstitutional no matter how the forum is characterized.  Therefore, there is no need to play the forum "classification game," Gilles v. Blanchard, 477 F.3d 466, 474 (7th Cir. 2007), and I decline to comment further on this issue.

**2.     Request for Monetary Relief**

Plaintiffs next argue that they are entitled to monetary relief even if the defendants have qualified immunity.  This is so, argue plaintiffs, because they are not seeking monetary relief in the form of damages but are seeking "reimbursement in the form of specific performance of the University's obligation to pay all of [RCF's outstanding expenditure requests]."  (Pls.' Mem. of Law in Supp. of Mot. for Recons. at 19.)  However, whether they call it "damages," "reimbursement," "specific performance," or "equitable relief," the remedy that plaintiffs seek is the payment of money out of defendants' own pockets.  Yet qualified immunity protects officials against personal liability for monetary relief regardless of the label used to describe it.  Lenea v. Lane, 882 F.2d 1171, 1178-79 (7th Cir. 1989).  Accordingly, qualified immunity precludes plaintiffs' claim for monetary relief even if such relief is labeled as something other than "damages."

**3.     Free Exercise and Equal Protection Claims**

Plaintiffs next argue that I should adjudicate their Free Exercise and Equal Protection claims against the University.  However, these are simply alternative legal

---

[7]Although reasonable content-based distinctions are permitted in a limited public forum, such distinctions are not permitted in a designated public forum unless the government satisfies strict scrutiny.  See, e.g., DeBoer v. Vill. of Oak Park, 267 F.3d 558, 566 (7th Cir. 2001).

theories seeking the same relief that plaintiffs seek in connection with their Free Speech claim.  Because plaintiffs have already won their Free Speech claim, analyzing their Free Exercise and Equal Protection claims would be superfluous and constitute the unnecessary consideration of constitutional questions.  See, e.g., Doe v. Heck, 327 F.3d 492, 527-28 (7th Cir. 2003) (stating that a federal court should avoid deciding constitutional issues unnecessarily).  Even if the University's policy violates the Free Exercise and Equal Protection clauses, defendants would still be entitled to qualified immunity based on their Establishment Clause defense because they reasonably believed that their interest in avoiding an Establishment Clause violation was a compelling state interest.  Cf. Capitol Square Review & Advisory Bd. v. Pinette, 515 U.S. 753, 761-62 (1995) (stating that compliance with the Establishment Clause may be a compelling state interest); Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist., 508 U.S. 384, 394-95 (1993) (same); Widmar v. Vincent, 454 U.S. 263, 271 (1981) (same).  Further, whether the constitutional violation is described as a Free Speech, Free Exercise, or Equal Protection violation, I would not award injunctive relief because, as I explain below, a declaratory judgment is adequate prospective relief.  Thus, because an analysis of plaintiffs' Free Exercise and Equal Protection claims would not change the outcome of the case, I will not further engage in such an analysis.

**4.     Request for Injunctive Relief**

In my September 24 decision, I declined to grant plaintiffs an injunction.  (Order at 28-29.)   Plaintiffs ask that I reconsider and enjoin defendants from refusing to fund "activities that involve or include elements of student prayer, worship, proselytizing, or sectarian religious instruction."  (Pls.' Mem. of Law in Supp. of Mot. for Recons. at 21.)

They ask that the injunction include language stating that the University may not exclude any religious speech from the forum on the ground that funding such speech would violate the Establishment Clause.  (Id.)

Before discussing plaintiffs' request, I reiterate that I have already granted declaratory relief and stated that the University's policy against funding any activity that it labels worship, proselytizing or sectarian religious instruction is unconstitutional, and that the Establishment Clause does not require the University to exclude plaintiffs' religious activity from its forum of segregated fees.  Thus, should the University in the future exclude student speech from the forum for no reason except that it considers the speech worship, proselytizing or sectarian religious instruction, plaintiffs can return to court and obtain additional relief.  Further, because the present litigation has clearly established that the Establishment Clause does not require the exclusion of worship, proselytizing or sectarian religious instruction from the segregated fee forum, in future cases University officials will not be entitled to qualified immunity, and so an injured student will be able to obtain monetary relief.

Plaintiffs' seek injunctive relief because they believe that the University "complies with the Constitution only when a court orders it to do so," that it will "return to its old ways in the future," and that it would be inefficient for them or another student group to return to court to obtain additional relief.  (Id.)  However, by way of the declaratory judgment, I have already ordered the University to abandon its unconstitutional policy, and I have no reason to believe that the University will not do so.  Further, even if I converted the declaratory judgment into an injunction, plaintiffs would still have to return to court in the event of a violation.  Injunctions do not enforce themselves, and thus an affected student group would

14

have to move for contempt sanctions or other relief if it regarded the University as violating its terms.  Also, any future proceedings brought to enforce an injunction would differ little from proceedings to enforce the existing declaratory judgment, and I therefore doubt that issuing an injunction would result in greater efficiency.  If anything, entering an injunction might waste judicial resources, since it could lead to continued judicial oversight of the administration of the University's segregated fee system when, at this point, there is no reason to believe that such involvement is necessary.  In sum, a declaratory judgment is adequate prospective relief.

Moreover, as I explained in my September 24 order, whether any particular activity or form of expression can or cannot be excluded from the segregated fee forum must be evaluated in light of the facts surrounding that particular activity or form of expression. (Order at 16-22, 27-29.) By maintaining its segregated fee forum, the University is not compelled to grant <u>every</u> request involving an activity that could be characterized as worship,  proselytizing or sectarian religious instruction.  These labels are themselves vague and could be reasonably affixed to a wide array of different activities and forms of expression.  Some future proposals that could be so labeled will be outside of the forum's limited purposes, and even if they are all within the forum's purposes, the University must be able to exercise some amount of discretion to determine how best to allocate the limited pool of segregated fees among student organizations.  Thus, I find that it would be inappropriate to enter an injunction (or any other order) stating that the University must fund <u>all</u> activities involving elements of worship, proselytizing, or sectarian religious instruction. Although the University cannot continue its policy of automatically disqualifying any activity that involves what it considers worship, proselytizing or sectarian religious instruction,

15

whether any future refusal to fund a specific religious activity is constitutional or not will have to be determined based on the facts surrounding that activity and the reasons that the University gives for refusing to fund it.

### CONCLUSION

For the reasons stated, **IT IS ORDERED** that plaintiffs' motion for reconsideration is **DENIED**.

Dated at Milwaukee, Wisconsin this 16 day of December, 2008.


/s_____
LYNN ADELMAN
District Judge

16